CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 0 1 2010

JULIA C. DUDLEY, CLERK
BY: /s/ P. Clark
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| WILLIAM R. COUCH, | ) |
| | )    **Civil Action No. 7:09cv00434** |
| Plaintiff, | ) |
| v. | )    **MEMORANDUM OPINION** |
| | ) |
| JOHN JABE, et al., | )    **By: Hon. James C. Turk** |
| | )    **Senior United States District Judge** |
| Defendants. | ) |

Plaintiff William R. Couch ("Couch"), a Virginia inmate proceeding pro se, has brought this action under the Civil Rights Act, 42 U.S.C. § 1983, alleging that Defendants Jabe, Garman, Braxton, Swisher, and Ryder violated his First and Fourteenth Amendment rights when they applied the Virginia Department of Corrections ("VDOC") Operating Policy 803.2 to exclude *Ulysses* and *Lady Chatterly's Lover* from the prison library and prevent him from ordering these books from a private, approved vendor.[1]  Couch seeks a declaratory judgment that certain sections of VDOC Operating Policy 803.2 ("O.P. 803.2") are unconstitutional, both facially and as applied.  He seeks injunctive relief, as well as punitive damages.  Couch filed a motion for summary judgment on December 17, 2009 (Dkt. No. 16).  The Defendants filed a cross-motion for summary judgment (Dkt. No. 21) on January 28, 2010.  Couch replied (Dkt. No. 26) and the matter is ripe for disposition.  For the reasons that follow, the Court finds that O.P. 803.2 is unconstitutional on its face and an injunction shall issue preventing Defendants from applying it forthwith.  Accordingly, the Defendant's motion for summary judgment is **DENIED**, and Couch's motion for summary judgment is **GRANTED**.

---

[1] Couch's complaint also included an allegation that the prison's policy which prevented Couch from receiving a free gift book (Protecting Your Health and Safety) was unconstitutional.  This Court dismissed this claim as duplicative of pending litigation also being heard in the Western District of Virginia, before the Honorable Norman K. Moon.  See Slip Opinion, Civil Action No. 7:09CV00434, June 15, 2010.

## I.  Factual and Procedural Background

Couch is an inmate at the Augusta Correctional Center located in Craigsville, Virginia, which is operated by the Virginia Department of Corrections.    Defendant John Jabe was the Deputy Director of Operations for VDOC at all relevant times detailed in the Complaint. Defendant John Garman was Regional Director of the Western Regional Office of VDOC at all relevant times.    Defendant Daniel Braxton was the Warden at Augusta Correctional Center. Defendant Swisher was an Operations Officer at Augusta Correctional Center, and the Warden's designee for enforcing compliance with VDOC Operating Policy 803.2.

Augusta Correctional Center contains a general purpose reading library, accessible to all the prisoners housed at the facility.  The library originally contained the two books which form the basis for Couch's complaint:  *Ulysses* and *Lady Chatterley's Lover*.[2]    On March 4, 2009, Defendant Swisher removed *Ulysses* from the prison library after determining that it was in violation of O.P. 803.2.  On April 22, 2009, prison staff also removed *Lady Chatterley's Lover* from the prison library after being alerted by the plaintiff that *Lady Chatterley's Lover* also contained sexually explicit passages.  Both of these books were forwarded to the Publication Review Committee ("P.R.C."), which reviewed these books to determine whether they were in compliance with O.P. 803.2.  The P.R.C. determined that these books violated O.P. 803.2 and

---

[2] These two books were, perhaps, chosen by the plaintiff to serve as the basis for his complaint because of their storied, litigious history.  James Joyce's *Ulysses* was, famously, the subject of a case for forfeiture by the United States when it was imported from France into the port of New York.  See United States v. One Book Called "Ulysses", 5 F. Supp. 182 (S.D.N.Y. 1933), *affirmed by* 72 F.2d 705 (2d Cir. 1934).  See also, Paul Vanderham, JAMES JOYCE AND CENSORSHIP: THE TRIALS OF ULYSSES, NYU Press (1997).  *Lady Chatterley's Lover*, by D. H. Lawrence, was the focus of a famous obscenity prosecution in England.  See R. v. Penguin Books, Crim. L.R. 176 (1961); see also, *The Chatterley Affair* (BBC Channel 4 television broadcast, June 19, 2010).  It was also, though less famously, the subject of litigation in New York after a copy was confiscated by the Postmaster General.  See Grove Press, Inc. v. Christenberry, 276 F.2d 433 (2d Cir. 1960).  Additionally, a movie based on *Lady Chatterley's Lover* was the basis of Kingsley Intern. Pictures Corp. v. Regents of the Univ. of the State of N.Y., 360 U.S. 684 (1959), in which the Supreme Court found that a New York statute which banned the importation of the film version was unconstitutional.

had been properly removed from the library.  Couch then attempted to purchase both *Ulysses* and

*Lady Chatterley's Lover* via mail, but his request was denied on the basis of the P.R.C.'s

previous determination that the books violated O.P. 803.2.  O.P. 803.2 lists the "Specific Criteria

for Publication Disapproval" and reads, in relevant part:

> L.    The Facility Unit Head, or his designee, should disapprove a
> publication for receipt and possession by offenders and forward it to the
> Publication Review Committee for final action if the publication can be
> reasonably documented to contain:
>> 1. Explicit or graphic depictions or descriptions of sexual acts,
>> including, but not  limited to:
>>> a. Actual Sexual intercourse, normal or perverted, anal, or oral
>>> b. Secretion or excretion of bodily fluids or substances in the
>>> context of sexual activity
>>> c. Lewd exhibitions of uncovered genitals in the context of sexual
>> activity
>>> d. Bondage, sadistic, masochistic or other violent acts in the
>>> context of sexual activity
>>> e. Any sexual acts in violation of state or federal law

See *Braxton Aff. Exh. A.* (VDOC Operating Procedure 803.2(L)(1), August 1, 2007.)

 To challenge each of these decisions by the prison officials and the P.R.C., Couch filed

the appropriate grievance.  When these grievances were denied, Couch also followed the proper

appeal process, and when those appeals were denied, Couch appealed again.  Defendant Jabe

made the final, Level III review of Couch's grievances – and determined that O.P. 803.2 was

appropriate and should not be modified.  See *Jabe Aff.* ¶ 8.  Couch then filed the instant case.[3]

---

[3] Section 1997(e) of the Prison Litigation Reform Act of 1955 ("PLRA") requires a prisoner to employ, or
"exhaust," all available administrative remedies before filing a 42 U.S.C. § 1983 action regarding prison conditions.
To satisfy the PLRA's exhaustion requirement, a prisoner must "properly exhaust" all administrative remedies
available.  Woodford v. Ngo, 548 U.S. 81, 93 (2006).  Proper exhaustion has been defined as "complet[ing] the
administrative review process in accordance with the applicable procedural rules."  Id. at 88.  Proper exhaustion,
therefore, requires a prisoner to carry out the administrative grievance process in its entirety, including appealing
any denial of relief through any appellate levels of review that are available.  See Booth v. Churner, 532 U.S. 731,
738-41 (2001).  It is uncontested by the Defendants, however, that Couch exhausted all administrative remedies.

### III.  Analysis

The issue of the constitutionality of O.P. 803.2 comes before the Court on cross-motions for summary judgment by the plaintiff and the defendants.  The parties do not dispute any material facts.  The Court's task, therefore, is to determine which party is entitled to judgment as a matter of law.  See FED. R. CIV. PRO. 56(c) (summary judgment is appropriate where "there is no issue as to any material fact and... the movant is entitled to judgment as a matter of law").

Couch's position is that O.P. 803.2 is facially invalid because it is overbroad and not rationally related to legitimate penological objectives.  Alternatively, he has asserted that O.P. 803.2 is unconstitutional as applied to *Ulysses* and *Lady Chatterley's Lover*.  Either way, Couch posits that O.P. 803.2 violates the First and Fourteenth Amendments and correspondingly infringes on the rights he enjoys under the First and Fourteenth Amendments.  Defendants answer by pointing out that O.P. 803.2 is intended to provide for the efficient, safe, and secure administration of VDOC facilities by limiting materials which might be disruptive in myriad ways.  Additionally, they argue that O.P. 803.2 provides for the rehabilitation of offenders by limiting materials which might be counter-productive.  They argue that the regulation, although it may restrict some First Amendment rights of offenders, is constitutional because it falls squarely within the "wide ranging deference [afforded to prison officials] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999).  This Court does not agree.

1. Couch's Rights Under The First Amendment

Couch has no right to a general purpose reading library under the First Amendment. Counts v. Newhart, 951 F. Supp. 579, 587 (E.D. Va. 1996) ("The Constitution contains no right of access to a general-literary library."). But because VDOC has decided to provide a general literary library to offenders, VDOC officials are constrained by the First Amendment in how they regulate the library. The prison officials do not have unfettered discretion to regulate the library in whatever manner they see fit: "the discretion of [state actors in regulating the library] must be exercised in a manner which comports with the transcendent imperatives of the First Amendment." Bd. of Educ., Island Trees Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 864 (1982) (plurality). In Pico the Court found the school officials violated the First Amendment because the action of the local authorities had "invad[ed] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." Id. (citing W.Va. Bd. of Ed. v. Barnette, 319 U.S. 624, 641 (1943)). Although these precedents addressed the rights of public school students rather than state prisoners, these two classes of individuals are similarly situated for the purposes of this analysis. See Cline v. Fox, 319 F. Supp. 2d 685, 690 (N.D.W.Va. 2004) ("Like prisoners, public school students have no constitutional right to a school library and otherwise must bear certain restrictions on their rights generally."); compare Turner v. Safely, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.") with Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech and expression at the

schoolhouse gate."). And sexually explicit materials are not exempted from First Amendment protections. See Reno v. Am. Civil Liberties Union, 521 U.S. 844, 874 (1997) (declaring it to be "perfectly clear that sexual expression which is indecent but not obscene is protected by the First Amendment"). Though state prisoners are, sensibly, more constrained in the rights they may exercise than are public school students, the Court is concerned not with the comparison between students and prisoners, but with how the state government actors employ their discretion. Having created a general reading library for state prisoners, VDOC has "assumed an obligation to justify its discriminations and exclusions [in the library] under applicable constitutional norms." Widmar v. Vincent, 454 U.S. 263, 268 (1981). Here, Couch alleges that the discretion employed by VDOC officials has resulted in the creation of an overly broad, unconstitutional regulation.

## 2. Overbreadth Of Prison Regulations Is Evaluated Under Turner v. Safley

Courts ordinarily determine the validity of an allegedly overbroad regulation simply by considering whether it "reaches a substantial amount of constitutionally protected conduct," but Couch's status as a prisoner affects this Court's analysis of the regulation's alleged overbreadth. City of Houston v. Hill, 482 U.S. 451, 458 (1987). In the prison context, regulations which "circumscribe constitutionally protected interests" are permitted "so long as [they] are reasonably related to legitimate penological interests." Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998) (quoting Turner, 482 U.S. at 89). Thus, for Couch to prevail in his claim of overbreadth, he must demonstrate that the challenged policy both circumscribes constitutionally protected conduct and is not "reasonably related to a legitimate penological interest." Turner, 482 U.S. at 89. This heightened standard set forth in Turner reflects the fact that "lawful

incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." In re Long Term Admin., 174 F.3d at 468 (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)). Accordingly, the Turner standard is meant to grant prison officials "wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id., at 469.

The Turner Court identified four factors to be considered in determining whether a challenged regulation is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. These four factors are:

> First...a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it....;
> Second...whether there are alternative means of excercising the right that remain open to prison inmates...;
> Third...[is what] impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally...;
> Finally, the absence of ready alternatives is evidence of the reasonablenesss of a prison regulation. ...By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns.

Id., 482 U.S. at 89-90. These factors have been applied to prison regulations banning sexually explicit material many times, and courts have often concluded that the challenged regulations are reasonably related to legitimate penological interests. See, e.g., Amatel, 156 F.3d at 196 (approving of Federal Bureau of Prisons regulation prohibiting visual depictions of pornography); Mauro v. Arpaio, 188 F.3d 1054 (9th Cir. 1999) (en banc) (approving of jail's policy of banning material containing frontal nudity); Waterman v. Farmer, 183 F.3 208 (3d Cir. 1999) (approving of New Jersey regulations prohibiting sexually oriented material at a special

facility for "repetitive and compulsive" sex offenders); Owen v. Willie, 117 F.3d 1235 (11th Cir. 1997) (approving of prison policy prohibiting nude photos).

Many regulations have been approved because the application of the Turner factors has always been a very deferential standard.  The Supreme Court in Thornburgh v. Abbott, 490 U.S. 401 (1989), concluded that "in the volatile prison environment, it is essential that prison officials be given broad discretion to prevent [publications]...with the concomitant potential for coordinated disruptive conduct...such as targeting a homosexual prisoner for assault." Thornburgh, 490 U.S. at 413.  Similarly, the Mauro Court noted that "when other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials...in gauging the validity of the regulation." Mauro, 188 F.3d at 1054.  Nevertheless, courts have found certain regulations to be beyond the limits of even a deferential application of the Turner standard.  See, e.g., Cline, 319 F. Supp. 2d at 685 (finding unconstitutional a policy prohibiting all books, magazines, paintings, and photographs that contained even one depiction of sexual intercourse); Aiello v. Litscher, 104 F. Supp. 2d 1068 (W.D. Wis. 2000) (finding unconstitutional a policy prohibiting any written, visual, video, or audio representation of human sexual behavior).  In the instant case, it is clear that when O.P. 803.2 is evaluated under the Turner factors the regulation can not be considered reasonably related to legitimate penological interests.

3. *Turner v. Safley* Factors Indicate O.P. 803.2 Is Unconstitutional

The Court believes that consideration of just the first and fourth Turner factors are more than sufficient to indicate the unconstitutional nature of O.P. 803.2.

8

### A. Is there a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it?"

It is evident that the stated policy objectives of O.P. 803.2 must be considered legitimate and content-neutral.   Defendant John Jabe, Deputy Director of VDOC, explained that the objectives of O.P. 803.2 were to prohibit materials that might threaten "the security, discipline, and good order in the facility" or be "detrimental to offender rehabilitation."   It hardly bears repeating that "central to all other corrections goals is the institutional consideration of internal security."   Pell v. Procunier, 417 U.S. 817, 823 (1974).   Equally legitimate is the objective of prisoner rehabilitation.   Amatel, 156 F.3d at 197 (describing it as "indisputable").   The objectives are content-neutral as well.   Thornburgh, 490 U.S. at 415-16 ("The regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.   Where...prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are neutral.").   Although Defendants have expressed several legitimate, neutral government interests, it is less clear that there is a rational connection between these legitimate, neutral governmental interests and a regulation which forbids all "explicit...descriptions of sexual acts" including "sexual acts in violation of state or federal law."   O.P. 803.2.

The requirement of a rational connection is not particularly demanding.   "The question is not whether [the warden's] conclusion was indisputably correct, but whether his conclusion was rational and therefore entitled to deference."   In re Long Term Admin., 174 F.3d at 470.   But although VDOC needed only to put forward "some minimally rational relationship between that objective and the means chosen to achieve that objective," they have clearly failed to do so.   Hines v. S.C. Dep't of Corr., 148 F.3d 353, 358 (4th Cir. 1998).   In fact, it is unlikely that a

cogent argument could be advanced which would explain how a regulation which forbids James Joyce's *Ulysses*, but permits Hugh Hefner's *Playboy*, has a rational relationship to the above-stated goals.    Any such argument would be irrational, if not utterly incomprehensible.    "A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."    Turner, 482 U.S. at 90.

The irrationality of O.P. 803.2 stems from the fact that it encompasses much of the world's finest literature, but does not extend to "soft core" pornography such as *Playboy* magazine.    The regulation forbids all "explicit...descriptions of sexual acts."    This includes descriptions of "actual sexual intercourse" as well as descriptions of "sexual acts in violation of state or federal law."    But the number of highly regarded books which include a description of actual sexual intercourse is vast.    Beyond *Ulysses* and *Lady Chatterly's Lover*, the Court could list dozens of the highly regarded works of literature which include an explicit description of a sexual act or intercourse.[4]    And although the prohibition on descriptions of sexual acts in violation of state or federal law appears to be more defensible at first blush, it suffers from the same fatal flaw of over inclusiveness.    This clause of the regulation would ban any book describing rape,[5] statutory rape,[6] attempted rape,[7] incest (Va. Code § 18.2-366),[8] adultery (Va.

---

[4] *Candide* by Voltaire;  *Brave New World* by Aldous Huxley;  *All the Pretty Horses* by Cormac McCarthy; *Droll Stories* by Honoré de Balzac; *Howl and Other Poems* by Allen Ginsburg;  [*The*] *Naked Lunch* by William S. Burroughs;  *Tropic of Cancer* by Henry Miller; *Slaughterhouse Five* by Kurt Vonnegaught; *Sophie's Choice* by William Styron, *Myra Breckenridge* by Gore Vidal;  *One Hundred Years of Solitude* by Gabriel Garcia Marquez; *For Whom the Bell Tolls* by Ernest Hemingway;  *A Farewell to Arms* by Ernest Hemingway; *Women in Love* by D. H. Lawrence; *As I Lay Dying* by William Faulkner; *The Handmaid's Tale* by Margaret Atwood; *Leaves of Grass* and *Song of Myself* by Walt Whitman, as well as nearly any novel by John Updike.
[5] *I Know Why The Caged Bird Sings* by Maya Angelou, *Go Tell It On The Mountain* by James Baldwin, and *Their Eyes Were Watching God* by Zora Neale Hurston all contain depictions of rape.
[6] *Lolita* by Vladimir Nabokov.
[7] Thus, prison officials might interpret the regulation to prohibit *To Kill a Mockingbird* by Harper Lee.
[8] *Oedipus Rex* by Sophocles; *Mourning Becomes Electra* by Eugene O'Neill.

Code § 18.2-365),[9] polygamy (Va. Code § 18.2-362),[10] sexual abuse,[11] and prostitution.[12] Perhaps an aggressive interpretation would include violations of the Mann Act (18 U.S.C. § 2421, a prohibition on "knowingly transport[ing] any individual in interstate or foreign commerce...with the intent that such individual engage in...any sexual activity for which any person can be charged with a criminal offense").[13]  The expansive reach of the prohibitions contained in this regulation gives rise to two separate problems.  First, it suggests that the application of the regulation may not be strictly enforced by the VDOC.  Second, it suggests that the regulation is incongruous with materials that do implicate the legitimate goals of the VDOC.

When regulations are not strictly enforced in prison contexts, the regulation can rightly be subjected to criticism as arbitrary.  See Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968). In fact, the arbitrary enforcement of regulations can be critiqued as counter productive and antithetical to the legitimate goals of the VDOC officials.  See id. ("The sporadic and discretionary enforcement of unreasonable regulations, it appears to us, is more likely to breed contempt for the law than respect for it and obedience to it...[and] would eventually discourage prisoners from cooperating in their rehabilitation.") (citing Note, *Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts*, 72 YALE LAW JOURNAL 506, 518-25 (1963)).  Indeed, Couch asserts that prison officials were notified that the books of the Old Testament contain explicit depictions of incest.[14]  Nonetheless, the Bible remains

---

[9] *The Scarlet Letter* by Nathaniel Hawthorne; *The World According to Garp* by John Irving; *Anna Karenina* by Leo Tolstoy; *The Postman Always Rings Twice* by James Cain.

[10] *Stranger in a Strange Land* by Robert A. Heinlein.

[11] *The Color Purple* by Alice Walker.

[12] *Moll Flanders* by Daniel DeFoe; *Tristessa* by Jack Keruoac; *Nana* by Emile Zola.

[13] One wonders whether the *Illiad*'s depiction of the abduction of Helen might be considered by prison authorities to be illustrative of a violation of the Mann Act, as she was abducted by Paris and transported in foreign commerce for the purposes of committing adultery, a criminal offense.

[14] See THE BIBLE, King James Version, *Genesis* 19:34-35 ("And it came to pass on the morrow that the firstborn said unto the younger, "Behold, I lay yesternight with my father. Let us make him drink wine this night also,

permitted reading material within the VDOC system.  In fact, Defendants admit that The Bible contains "a description of a sexual act that would be in violation of federal and state laws in our own time."  *Def. Response to Request for Admission*, at 12 (Dkt. No. 30).   Defendants' explanation for this discretionary enforcement of OP 803.2 is an appeal to morality: "I think the DOC can argue that the Holy Bible....tell[s] of such acts in the context of condemning and DISCOURAGING humanity from practicing such immoral acts."  Id. (capitalization in original). When a publication that clearly violates O.P. 803.2 is permitted by the VDOC, presumably because the VDOC has sensibly concluded that The Bible does not endanger the security, discipline and good order of the prison nor threaten the prisoner's rehabilitation, the argument by VDOC that there is a logical connection between the broad scope of the regulation and their legitimate goals is fundamentally weakened.  Instead, the broad reach of the regulation merely provides an opportunity for arbitrary enforcement of this regulation on the basis of the VDOC chaplain's moral judgment.[15]    In fact, such a broad regulation may actually *encourage* an arbitrary and potentially discriminatory enforcement of the regulation on such nebulous rationales.[16]  Thus, VDOC's admission raises the question of whether the regulation is connected to content-neutral objectives as presumed above, or whether the broad regulation was preferred by the VDOC because the arbitrary enforcement of it allows for non-content neutral objectives to

---

and go thou in and lie with him, that we may preserve seed of our father.  And they made their father drink wine that night also.  And the younger arose and lay with him; and he perceived not when she lay down, nor when she arose.")

[15] Of course, a case-by-case evaluation of works of literature would quite clearly be permitted were the factors for the case-by-case evaluation set forth in the regulation and non-discriminatory.  Such was the holding in Thornburgh, 490 U.S. 401, 417 n. 15 where the adequacy of the regulations as applied were to be considered on remand to the District Court.  See also, Waterman v. Farmer, 183 F.3d 208, 210 (3rd Cir. 1999) (describing constitutionally permissible N.J. regulation which permits corrections officers to evaluate publications on a case-by-case basis, only excluding those works which  "lack, as a whole, serious literary, artistic, political, or scientific value").  The conclusion of the VDOC chaplain that the morality of the bible militates for an exception does not compare to the standard approved of by the Third Circuit.

[16] Although not directly applicable here, this conclusion would be sufficient to invalidate a criminal law for vagueness. See City of Chicago v. Morales, 527 U.S. 41, 56 (1999).

be furthered by VDOC officials.  The Court need not dwell too long on the constitutional deficiencies of arbitrary and discriminatory enforcement, however, because the lack of a logical connection between the regulation and the legitimate goals is sufficiently exhibited by the regulations incongruity with the stated goals.

It strains credulity to believe that limiting a prisoner's access to *Lady Chatterley's Lover* could have *any* effect on the security, discipline, and good order of the prison.  Likewise, it would be patently incredible to assert that reading Joyce's *Ulysses* will somehow threaten the rehabilitation of a prisoner.  Certainly, VDOC has not provided any scientific or expert evidence that supports such connections.[17]  Instead, Defendants argue that all "sexually explicit materials are considered valuable currency and used in bartering within the prison setting" and that "the possession of such items may lead to stealing, fights, assaults and other disruptive activities." *Def. Brief* ¶ 17.  Moreover, they contend that "constant exposure to sexually explicit material may promote violence among certain offenders who have a predisposition to seeking immediate immediate [sic] gratification sexually." Id.  Similarly, "permitting access to sexually explicit materials undermines rehabilitation efforts." Id.  Finally, they contend that "excluding sexually explicit materials is necessary to reduce the sexual harassment of staff and their exposure to a hostile work environment."[18]  As such, VDOC appears to be relying on the common sense of the

---

[17] It bears mentioning that the Defendants "need not prove that the banned material actually caused problems in the past, or that the materials are likely to cause problems in the future." Mauro, 188 F.3d at 1060 (citing Thornburgh, 490 U.S. at 417).  But this Court is in no way requiring such evidence.

[18] Presumably, Defendants have appended this explanation to their brief, which went otherwise unmentioned by any defendant, in an attempt to analogize these circumstances to those in Mauro, 188 F.3d at 1060 ("In the past, inmates have used nude photographs to…draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers").  This analogy is unfounded because the Mauro Court was specifically addressing a prohibition on nude photographs or visual representations that had been used to harass female officers.  Here, VDOC would have the Court believe that any sexually explicit material might be so used.  However, the Court considers it to be extremely unlikely that the Walt Whitmam poem "A Woman Waits For Me" from his opus *Leaves of Grass*, though it clearly violates O.P. 803.2(L)(1)(b) by describing "secretion…of bodily fluids or substances in the context of sexual

Court to see the logical connection between these goals and the challenged policy. <u>Amatel</u>, 156 F.3d at 199 (holding that common sense can be sufficient evidence of a rational link between legitimate objectives and a challenged regulation). The common sense of the Court, as well as the opinions of nearly every other court to consider such a broad regulation, leads the Court to the contrary conclusion: there is no rational connection between O.P. 803.2 and the legitimate objectives of the VDOC.

The court in <u>Cline v. Fox</u>, 319 F. Supp. 2d 685 (N.D. W.Va. 2004) expressly found a policy to be irrational when it would "permit magazines such as *Playboy* or *Maxim*, which objectify women in order to sexually arouse or gratify men…[but] forbid James Joyce's *Ulysees*, ostensibly because such books 'create an intolerable risk of disorder.'" <u>Id.</u> at 693. Similarly, a lack of rationality was evident because, "to curtail sexual assaults, the regulation presumptively prohibits *The Canterbury Tales* but welcomes *Playboy*." <u>Id.</u> The Court of Appeals for the District of Columbia Circuit, while holding constitutional the Ensign Amendment's ban on the distribution of sexually explicit material or exhibitions of nudity in federal prison, ridiculed a possible broad interpretation of the regulations applying the Ensign Amendment. "We find it all

---

activity" would be quoted by prisoners who wished to sexually harass female correctional officers. Though certainly risqué, it is by no means the material one imagine might create a hostile work environment. To wit:

> It is I, you women—I make my way,
> I am stern, acrid, large undissuadable—but I love you,
> I do not hurt you any more than is necessary for you,
> I pour the stuff to start sons and daughters fit for These States—I press with slow rude muscle,
> I brace myself effectually—I listen to no entreaties,
> I dare not withdraw 'til I deposit what has so long accumulated within me.
>
> Through you I drain the pent-up rivers of myself,
> In you I wrap a thousand onward years,
> On you I graft the grafts of the best-beloved of me and America,
> The drops I distill upon you shall grow fierce and athletic girls, new artists, musicians, and singers,
> The babes I beget upon you are to beget babes in their turn,
> I shall demand perfect men and women out of my love-spendings,
> I shall expect them to interpenetrate with others, as I and you interpenetrate now,
> I shall count on the fruits of the gushing showers of them,
> As I count on the fruits of the gushing showers I give now,
> I shall look for loving crops from the birth, life, death, immortality, I plant so lovingly now.

14

but impossible to believe that the Swimsuit Edition and [the] Victoria's Secret [Catalog] pass muster while Michelangelo's *David* or concentration camp pictures fail; nor has there been any suggestion that any prison official has attempted to implement such a *bizarre interpretation*." Amatel, 156 F.3d at 202 (emphasis added).   In the present case, we have precisely what the Amatel Court ridiculed: a bizarre interpretation of a regulation which results in the prohibition of James Joyce's *Ulysees* but the distribution of *Sport's Illustrated* Swimsuit Edition.   Moreover, the Amatel Court was merely concerned with visual depictions:  "Leaving aside these possible fringe applications of the regulation, we again note that the regulation by its terms only restricts pictures; a prisoner may read anything he pleases."   Id.  Presumably, the Amatel Court would have endorsed the "dissent's appeal to the value of ideas, pointing by way to the vistas opened for Malcolm X by his prison *reading*" had the regulation, in fact, banned prisoner's reading materials.   Id. (emphasis in original).[19,20]    Likewise, the Aiello Court found irrational a Wisconsin prison policy which banned works by Michelangelo, and where "logic suggests the regulation prohibit access to such great works of literature as The Bible and the writings of Walt Whitman, as well as countless others whose depictions of nudity and sexual intimacy are enlightening and inspiring rather than degrading and disrespectful."  Aiello, 104 F. Supp. 2d at 1080.

It is undeniable that O.P. 803.2 can be applied to material which may be injurious to prison objectives, and with respect to those publications the regulation would be supported by a rational connection.  But when the regulation sweeps so broadly that it can be said to engage in

---

[19] Instead, the Amatel Court quite rightly noted that comparing Malcolm X's prison reading to pornographic pictures "makes no sense here."  Amatel, 156 F.3d at 202.

[20] Ironically, O.P. 803.2 would permit publications banned by the Amatel regulation because under O.P. 803.2 only "lewd exhibitions of uncovered genitals in the context of sexual activity" are prohibited – thus permitting "soft core" pornography and nudity **not** in the context of sexual activity.

"bizarre interpretations" it must be deemed irrational as a whole.   And it is a bizarre interpretation to suggest that an inmate's possession of *Ulysses* would be used for "bartering" or "lead to stealing, fights, assaults and other disruptive activities."   Particularly with respect to *Ulysses* it is impossible to even imagine prison inmates fighting for the chance to delve into the incredibly difficult to decipher novel, one metaphor-laden scene of which portrays exhibitionist behavior and masturbation.[21]   And *Ulysses* is universally regarded a difficult read throughout. See U.S. v. One Book Entitled *Ulysses* by James Joyce, 72 F.2d 705, 707 (2d Cir. 1934) (finding *Ulysses* to be not obscene, and noting that "page after page of the book is, or seems to be, incomprehensible").   Yet O.P. 803.2 does not differentiate between literature which has been described as

> "show[ing] how the screen of consciousness with its ever shifting kaleidoscopic impressions carries, as it were on a plastic palimpsest, not only what is in the focus of each man's observation of the actual things about him, but also in a penumbral zone residua of past impressions, some recent and some drawn up by association from the domain of the subconscious"

and publications which are, admittedly, gratuitous smut.   U.S. v. One Book Entitled *Ulysses* by James Joyce, 5 F. Supp. 182 (S.D.N.Y. 1933), *affirmed by* 72 F.2d 705 (2d Cir. 1934); cf. "Playboy FAQ," available at http://www.playboy.com/articles/the-playboy-faq/index.html

---

[21] "And she saw a long Roman candle going up over the trees, up, up, and, in the tense hush, they were all breathless with excitement as it went higher and higher and she had to lean back more and more to look up after it, high, high, almost out of sight, and her face was suffused with a divine, an entrancing blush from straining back and he could see her other things too, nainsook knickers, the fabric that caresses the skin, better than those other pettiwidth, the green, four and eleven, on account of being white and she let him and she saw that he saw and then it went so high it went out of sight a moment and she was trembling in every limb from being bent so far back that he had a full view high up above her knee where no-one ever not even on the swing or wading and she wasn't ashamed and he wasn't either to look in that immodest way like that because he couldn't resist the sight of the wondrous revealment half offered like those skirtdancers behaving so immodest before gentlemen looking and he kept on looking, looking. She would fain have cried to him chokingly, held out her snowy slender arms to him to come, to feel his lips laid on her white brow, the cry of a young girl's love, a little strangled cry, wrung from her, that cry that has rung through the ages. And then a rocket sprang and bang shot blind blank and O! then the Roman candle burst and it was like a sigh of O! and everyone cried O! O! in raptures and it gushed out of it a stream of rain gold hair threads and they shed and ah! they were all greeny dewy stars falling with golden, O so lovely, O, soft, sweet, soft!" ULYSSES, James Joyce, p. 366.

("Does anybody really read Playboy for the articles? …The only people who can rightfully claim to read it solely for the articles are the thousands of blind readers who peruse our Braille edition…").  A regulation which does not discriminate between works such as James Joyce's *Ulysses* and common pornography, and instead posits that all sexually explicit material is "disruptive," "threatens prison security," or "undermines offender rehabilitation," yet all the while permitting *Playboy* and forbidding *Ulysses*, is incongruous with the regulation's stated goals.  Thus, such a regulation does not possess the constitutionally required rational connection between regulation and the legitimate governmental objective.

### B. Regulation Is Not Reasonable, But An Exaggerated Response To Prison Concerns

The fourth Turner factor asks the Court to consider whether there are alternative policies that advance the objectives of the prison officials and do not infringe upon the prisoner's rights. It thus bears repeating what these objectives are: maintaining "the security, discipline, and good order in the facility," facilitating "offender rehabilitation," and reducing sexual harassment of prison staff. *Jabe Aff.* ¶ 8, *Def. Brief* ¶ 17.  And throughout the country, courts have "recognized States' legitimate concerns that the presence of pornography among offenders may hamper rehabilitation, …threaten security, and lead to increased incidence of sexual harassment of female officers." Aiello, 104 F. Supp. 2d at 1081.  But quite clearly alternative regulations to address these concerns exist, as evidenced by decisions upholding more limited regulations by other courts. See Thornburgh, 490 U.S. at 405 (permitting a regulation prohibiting materials due to the "individualized nature of the determinations required by the regulation"); Owen, 117 F.3d at 1237 (permitting limited nudity ban while cautioning that a "blanket ban on nude photographs would be unconstitutional"); Mauro, 188 F.3d 1054 (permitting policy banning only visual

depictions of frontal nudity, while noting that "it does not ban sexually explicit letters,...sexually explicit articles,...or photographs of clothed females"); Amatel, 156 F.3d at 202 (permitting policy restricting pictures, while noting that "a prisoner may *read* anything he pleases") (emphasis in original). In fact, the Court notes that a court in this district previously upheld a less restrictive regulation. See Hodges v. Commonwealth of Va., 871 F. Supp. 873, 877 (W.D. Va. 1994) (Wilson, J.) (upholding regulation because "alternative means of exercising the First Amendment Right were available to Virginia inmates because DOP 852 does not deprive inmates of all sexually explicit publications" while noting that the Magistrate Judge "expressly reserved the question whether the VDOC could ban all sexually explicit material").[22]   It is apparent that alternatives exist to this policy which "fully accommodate the prisoner's rights at de minimis cost to valid penological interests...[which is] evidence that the regulation does not satisfy the reasonable relationship standard." Turner, 482 U.S. at 91. This regulation is merely "an exaggerated response to the state's legitimate concerns," and accordingly, must be declared unconstitutional. Id.

4. Prospective Relief and Punitive Damages

        Having found a constitutional violation, the Court must consider the appropriate remedy, a question also heavily influenced by the unique prison context in which it arises. Under 18 U.S.C. § 3626(a)(1)(A):

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

---

[22] Former Magistrate Judge Cynthia Kinser, of course, now sits on the Supreme Court of Virginia.

Moreover, the Court is cognizant that, with respect to the legitimate concerns of the VDOC, "such considerations are peculiarly within the province and professional expertise of corrections officials...and courts should ordinarily defer to their expert judgment in such matters." Jones v. N.C. Prisoner's Labor Union, Inc., 433 U.S. 119, 128 (1977). Thus, it is appropriate for "prison administrators...and not the courts...to make difficult judgments concerning institutional operations." Thornburgh, 490 U.S. at 409. Simply put, this Court is in no position to draft a new policy for the VDOC concerning what types of publications containing sexually explicit materials are permitted to enter the facility.[23]

Although punitive damages are available under § 1983, they are not appropriate here. Smith v. Wade, 461 U.S. 30, 51 (1983) (holding that punitive damages are available in cases of "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law").

An injunction is appropriate in these circumstances, because it will extend "no further than necessary to correct the violation of the Federal right" and will have no "adverse impact on public safety" and minimal impact on "the operation of a criminal justice system." 18 U.S.C. § 3626(a)(1)(A). And although the Court believes an injunction in the prison context should be primarily evaluated under the PLRA standards, an injunction would be appropriate under the well established principles of equity for granting a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) ("A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law...are inadequate; (3) considering the hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) the public

---

[23] Defendants may wish to consider, however, the various policies and revisions discussed in Waterman v. Farmer, 183 F.3d 208, 210 (3rd Cir. 1999) (upholding a revised N.J. policy which would apply only to compulsive and repetitive sex offenders in special prison).

interest would not be disserved by a permanent injunction"). These factors are met here because an ongoing violation of Couch's constitutional rights is an irreparable injury, with no remedy available at law. Moreover, as detailed above, this injunction will neither impose more than a minimal hardship on the Defendant VDOC officials nor disserve the public interest because the VDOC can easily amend O.P. 803.2 to comply with the First and Fourteenth Amendments.

Accordingly, the Court will hold the current version of O.P. 803.2 unconstitutional and enjoin Defendants from enforcing and applying it. Just as this solution is consistent with the text of the PLRA, 18 U.S.C. § 3626(a)(1)(A), it is consistent with the policies embodied by PLRA, which "attempts to eliminate unwarranted federal-court interference with the administration of prisons." Woodford, 548 U.S. at 93. The Court will not interfere with the administration of VDOC more than is necessary to strike down an unconstitutional regulation.

The Virginia Department of Corrections is, therefore, offered an opportunity to amend, revise, or modify O.P. 803.2 in accordance with this Memorandum Opinion. Alternatively, the Virginia Department of Corrections may wish to draft a new, constitutionally permissible policy to replace O.P. 803.2. The Court will stay the injunction for a period of sixty days.


## IV. CONCLUSION

For the reasons detailed above, the Court finds that O.P. 803.2 is facially unconstitutional. It follows that plaintiff Couch is entitled to a judgment as a matter of law. Accordingly, Couch's motion for summary judgment should be **GRANTED** and the Defendants' motion for summary judgment should be **DENIED**.

The Clerk of Court is directed to send a copy of this Memorandum Opinion and accompanying Final Order to Plaintiff and counsel of record for all Defendants.

**ENTER**: This _3 1st_ day of August, 2010.

Hon. James C. Turk
Senior United States District Judge